IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| Gordon G. Smith,<br><br>   Plaintiff,<br><br>v.<br><br>David Angelo, Robert Coupe, James Fraley,<br>Carl Danberg, and David Weaver,<br><br>   Defendants. | Civil Action No. 14-1066-GMS |

## MEMORANDUM

### I. PROCEDURAL POSTURE

On August 19, 2014, Plaintiff Gordon Smith filed suit against Defendants David Angelo, Robert Coupe, Carl Danberg, James Fraley, and Unknown Defendants. (D.I. 2). Plaintiff filed an Amended Complaint on April 22, 2016, against David Angelo, Robert Coupe, James Fraley, Carl Danberg, and David Weaver. (D.I. 20). Plaintiff brought suit under § 1983, alleging false arrest, false imprisonment, excessive force, conspiracy, and failure to properly hire, train, and/or supervise. *Id.* Plaintiff also brought state law claims for negligent infliction of emotional harm, intentional infliction of emotional harm, and gross negligence. *Id.* All of Plaintiff's claims arise out of the events that unfolded on August 28, 2012.

Presently before the court is Defendants' Motion for Summary Judgment on all of Plaintiff's claims. For the reasons that follow, the court will grant Defendants' motion.[1]

---

[1] The court simultaneously denies Plaintiff's Motion for Leave to File a Second Amended Complaint. (D.I. 55). Plaintiff's motion seeks to add Detective Paul R. Surowiec as a defendant to this action. (D.I. 55-1 ¶ 3). Such an addition would be futile. The court determined, based on the present record, that Detective Surowiec had probable cause to arrest Plaintiff. The facts Plaintiff seeks to add in the Second Amended Complaint would have no effect on the court's finding that probable cause existed based on both Surowiec's and Angelo's knowledge at the time of arrest. The Second Amended Complaint also adds nothing to Plaintiff's excessive force and gross negligence claims. For those reasons, the court denies Plaintiff's motion.

## II. BACKGROUND

Around 6:48pm on August 28, 2012, Delaware State Police received a call from Marvin Miller that a woman was lying beside a car in a ditch. A-179. According to Mr. Miller, the woman was wearing only her underwear, she was saying that someone wrote something on her, and she was saying that someone cut her.[2] *Id.* In response to that call, Trooper Sidney Nash was dispatched by Delaware State Police to 8184 Westville Road in Camden Wyoming, Delaware, to investigate that report. A-179; A-333, 9:13–20. When Trooper Nash arrived on the scene, he observed exactly what Mr. Miller had reported: a white female—later identified as Tiffany Smith—lying on her stomach on the shoulder of the roadway with just her underwear on and writing on her body. A-334, 12:20–13:10. Trooper Nash observed the words "bitch" and "die" on her stomach along with a smiley face drawing. *Id.* 17:14–17.

The Delaware State Police dispatch—referred to as KentCom—had a record of Mr. Miller's call, reflecting that Mr. Miller called-in around 6:48pm on August 28, 2016. A-179. Immediately after Mr. Miller called in, the narratives that went out over KentCom stated that there was "a female lying beside car in the ditch," she "only [had] underwear on, and she was claiming

---

[2] Though neither party raised hearsay or admissibility objections, the court thinks it wise to obviate any future objections to the evidence on which the court relied. "The rule in this circuit is that hearsay statements can be considered on a motion for summary judgment if they are capable of being admissible at trial." *Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc.*, 63 F.3d 1267, 1275 n.17 (3d Cir. 1995). Further, the Third Circuit has made clear that "probable cause may rest upon hearsay, provided there exists 'a substantial basis for crediting the hearsay.'" *Torres v. City of Philadelphia*, No. 13-2710, 2016 WL 7396723, at *2 (3d Cir. Dec. 21, 2016) (quoting *United States v. Ventresca*, 380 U.S. 102, 108 (1965)); see *United States v. Welebir*, 498 F.2d 346, 350 n.2 (4th Cir. 1974) (explaining that hearsay, and even double hearsay, can provide a legal basis for a search warrant). In *Torres*, the Third Circuit found that the arresting officer had probable cause based on his testimony that he relied on statements by medical personnel and statements by the victim's family. *See Torres*, 2016 WL 7396723, at *2. Further, it seems likely that the Delaware State Police dispatch report and the police officer reports would be admissible under Federal Rule of Evidence 803(8), the public records exception to the hearsay rule. Additionally, the court notes that a number of the statements made to dispatch and to the officers involved are not used to prove the truth of the matter asserted, but rather, to evidence that the officers involved in the arrest heard the statements. *See* Fed. R. Evid. 801(c)(2); *see also Woods v. City of Chicago*, 234 F.3d 979, 986 (7th Cir. 2000) (holding that as long as a reasonably credible witness or victim informs the police that someone has committed a crime, the officers have probable cause to arrest that person—"the existence of probable cause to arrest does not depend on the actual truth of the complaint").

"someone cut her on [her] throat and stomach." *Id.* Shortly after units were dispatched to the scene of the crime, further narratives were added to the dispatch report stating that the victim had writing on her and that the suspect was Gordon Smith. *Id.* The dispatched units arrived on the scene at around 6:57pm, and the KentCom report also stated that "Troop 3 [was] aware." *Id.* At around 7:00pm, KentCom reported that the victim was Tiffany Smith. *Id.* Between 7:06pm and 7:07pm, KentCom reported that the suspect was Gordon Smith, he was on home probation, he had prior assault charges, he had an active PFA against him dated August 28, 2012, and he was a "convicted domestic offender." *Id.* At 7:15pm, KentCom reports that Tiffany Smith's mother called the Delaware State Police just before Mr. Miller called. A-177. Tiffany Smith's mother told the police that she received a call from Tiffany Smith and Tiffany told her mother that she had been assaulted and she did not know where she was. *Id.* Tiffany Smith's mother also told the dispatcher that they had been to court earlier that day to get a Protection from Abuse order against Gordon Smith, and at that hearing, Mr. Smith threatened to kill Tiffany Smith and their children. *Id.* That information was reported over KentCom at around 7:17pm. *Id.* At around 7:15pm, KentCom notes that Detective Cosgrove might be reporting to the scene of the crime. A-178.

After Tiffany Smith was transported from the scene to the hospital by Emergency Medical Services, Trooper Nash questioned Mr. Miller about how he found Ms. Smith. *Id.* According to Mr. Miller, he was driving westbound on Westville Road when his passenger saw Ms. Smith lying on the road. *Id.* Mr. Miller turned around and went back to where Ms. Smith was lying. *Id.* 20:6–11. According to Trooper Nash's deposition testimony and his police report, Mr. Miller tried to speak to Ms. Smith, but he could not understand her so he called 911. *Id.* 21:2–12; A-188. Mr. Miller was told by dispatchers to ask Ms. Smith who attacked her. *Id.* 21:2–12. When asked who assaulted her, Ms. Smith replied that it was her ex-husband, Gordon Smith. Id. She also told Mr.

3

Miller that "they kept kicking and punching [her]." A-188. When Trooper Nash asked Mr. Miller if Tiffany identified who "they" were, Mr. Miller said "no." *Id.*

Around the same time that Mr. Miller called 911 to report a woman lying naked on the side of the road, Probation Officer Angelo, along with two other Probation Officers, Stagg and Wallace, were visiting the homes of probationers under their watch. A-055, 19:9–11. They were listening to KentCom when they heard a report stating that a woman was found naked lying on Westville Road with cut and stab wounds. *Id.* 19:11–18. Angelo also testified that Kentcom identified the victim as Tiffany Smith, and that her husband, Gordon G. Smith, was a suspect in the crime. *Id.* 19:18–21. Angelo contacted State Police Troop 3, and told Trooper First Class Blomquist that, because Gordon Smith was part of the Global Positioning Satellite (GPS) monitoring program, Angelo and his fellow probation officers could find and detain Mr. Smith. *Id.* 19:22–20. Mr. Smith was on GPS monitoring as a condition of his release pending trial. A-023, 65:5–12. Angelo was advised that a Sergeant would call him back and let him know if Mr. Smith needed to be detained. *Id.* 20:4–5.

Angelo, Stagg or Wallace—the record is not clear as to which one—called the GPS monitoring center to get Mr. Smith's coordinates so that they could get in position should they receive instruction from Troop 3 to find and detain Mr. Smith. A-061, 43:16–21. At around 7:10pm, Angelo, Stagg and Wallace met up with Probation Officer Wheeler so that they would have an additional person for back-up should they require it. *Id.* 44:21–13.

Detective Surowiec, the on-call detective for Troop 3, was the officer that gave Probation Officer Angelo the "go-ahead" to detain Mr. Smith. A-190. Detective Surowiec spoke with both Officer Saucier and Detective Cosgrove before instructing Angelo to detain Mr. Smith. *Id.* Officer Saucier was the one sitting at the desk in Troop 3 on the night of August 28, 2012. A-347, 8:10–

4

11. According to Officer Saucier's deposition testimony, when you are the one sitting at the desk, you are the person that everyone on the road calls for advice or to report what is going on that night. *Id.* 8:17–21. Officer Saucier testified that it would then be her duty to inform someone like Surowiec, the detective on-call for that night, of what was occurring "on the road." *Id.* 8:22–9:20. Detective Surowiec's police report from the night of August 28, 2012, notes that he received reports from the scene that a victim was found in a ditch on Westville Road, the victim had been stabbed multiple times and her throat was cut. A-190. Detective Surowiec also noted that troopers at the scene relayed that the victim was Tiffany Smith and that she identified her attacker as her ex-husband, Gordon Smith. *Id.*

Detective Surowiec's police report states that he determined that Gordon Smith should be detained after speaking with Detective Cosgrove. *Id.* Surowiec felt that "due to the lengthy history between the two parties, the severity of the incident . . . , the safety of the couple's children, as well as the safety of the public in general," detaining Mr. Smith, at least briefly, was the correct call. *Id.* Surowiec's police report also notes that he was concerned that if the incident was an attempted homicide, Mr. Smith may try to flee. *Id.*

After Detective Surowiec called Angelo and advised him that he should attempt to find and detain Mr. Smith, Probation Officer Wallace reached out to the probation officers' supervisor, Officer Gomez. A-062, 48:14–15:1. Wallace informed Officer Gomez that Delaware State Police Troop 3 had requested assistance from probation in detaining Mr. Smith. *Id.* 48:17–20. Supervisor Gomez approved the detainment of Mr. Smith. *Id.* 49:17–51:18. Mr. Smith's GPS points appeared to be stationary at the Texas Roadhouse at 4568 South Dupont Highway. A-063, 52:8–9. After looking around in the parking lot of the Texas Roadhouse, the probation officers located Mr. Smith sitting in the driver's seat of his vehicle. *Id.* 52:21–53:3. Angelo approached Mr. Smith's vehicle

from the passenger side, while the other three probation officers approached the vehicle from the driver's side. A-055; 20:20–21:1. Angelo knocked on the front window of Mr. Smith's car and told Mr. Smith to step out of the vehicle. *Id.* 21:1–2. When Mr. Smith stepped out of the vehicle, he stated that the probation officers "wrestl[ed]" with him a little bit and told him to "quit fighting." A-029, 71:11–16. Mr. Smith stated at his deposition that he was stiff from the shock of the incident. *Id.* 71:16–18. Mr. Smith also stated that one of Angelo's fellow probation officers pointed a gun at him. *Id.* 71:18–21. Angelo confirmed that Officer Wheeler did point his gun at Mr. Smith. A-063, 53:24–4. Officer Wheeler placed Mr. Smith in handcuffs and told him that he was being detained at the request of the Delaware State Police. A-030, 72:1–6; A-055, 21:2–5. Officer Wheeler was also responsible for putting Mr. Smith into the patrol car. A-031, 73:2–7. Mr. Smith asked the probation officers what he did wrong. A-029, 71:23–24. The probation officers advised Mr. Smith that he should remain quiet until he spoke with a detective at Troop 3. A-055, 21:10–17.

Surowiec's police report notes that Angelo took Mr. Smith into custody at 7:32pm. A-190. After Mr. Smith was transported to Troop 3, he was placed in cell one because two females were on the detention bench and the interview room was being used. A-182. Once it was determined that Tiffany Smith staged the scene, Sergeant Cosgrove went to Troop 3 and took Mr. Smith out of the cell. *Id.* Cosgrove brought Mr. Smith to the interview room to explain the situation and ask him what he had done that day. *Id.* After the conversation in the interview room, Cosgrove drove Mr. Smith back to the Texas Roadhouse. *Id.* Mr. Smith testified during his deposition that he believes he was in the cell for about two and a half hours. A-041:11–18.

### III. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to

6

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also* Celotex *Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of proving that no genuine issue of material fact exists. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n.10 (1986). A fact is material if it "could affect the outcome" of the proceeding. *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011).

There is a genuine issue "if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." *Id.* When determining whether a genuine issue of material facts exists, the district court must view the evidence in the light most favorable to the nonmoving party and draw inferences in that party's favor. *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). If the moving party is able to demonstrate an absence of disputed material facts, the nonmoving party must then "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citing Fed. R. Civ. P. 56(e)).

The existence of some evidence in support of the nonmoving party will not be sufficient for denial of a summary judgment motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Rather, the nonmoving party must present enough evidence to enable a jury to reasonably find for it on that issue. *Id.* The party opposing summary judgment must present more than just "mere allegations, general denials, or . . . vague statements" to show the existence of a genuine issue. *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991). As such, a nonmoving party must support their assertion that a material fact is in dispute by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only),

7

admissions, interrogatory answers, or other materials"; or "(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The moving party is entitled to summary judgment as a matter of law if the nonmoving party fails to make a sufficient showing on an essential element of its case for which it has the burden of proof. *Celotex*, 477 U.S. at 322.

In § 1983 cases specifically, the existence of probable cause is usually a question of fact for the jury. *Sherwood v. Mulvihill*, 113 F.3d 396, 401 (3d Cir. 1997). When considering a motion for summary judgment, a court may conclude, however, "that probable cause did exist as a matter of law if the evidence, viewed most favorably to Plaintiff, reasonably would not support a contrary factual finding." *Id.*

## IV. DISCUSSION

### A. Section 1983 Claims

Section 1983 provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory of the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. Section 1983 does not itself create substantive rights. *Groman v. Twp. of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995). Instead, it provides a remedy for violations of rights created by federal law. *Id.* In order to state a claim for relief under § 1983, "a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (U.S. 1988).

8

Here, Plaintiff raises claims for false arrest and false imprisonment.[3] Essentially, Plaintiff contends that his Probation Officer, David Angelo, arrested him without probable cause in violation of Plaintiff's Fourth Amendment rights. Defendants do not dispute that Angelo was acting under the color of state law when he arrested Plaintiff. The court, therefore, focuses its analysis on whether or not there was a Constitutional violation of Plaintiff's Fourth Amendment rights.

To satisfy the prima facie case for false arrest under the Fourth Amendment, "a plaintiff must establish: (1) that there was an arrest; and (2) that the arrest was made without probable cause." *James v. City of Wilkes-Barre*, 700 F.3d 675, 680 (3d Cir. 2012). The Fourth Amendment prohibits arrests without "probable cause, supported by Oath or affirmation." U.S. Const. amend. IV. "[P]robable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Orsatti v. New Jersey State Police*, 71 F.3d 480, 483 (3d Cir. 1995). The standard for assessing whether probable cause existed at the time of arrest recognizes the interests of both the citizen—protection against "unreasonable search and seizures, U.S. Const. amend. IV.—and the police officer—the ability to take quick action "before necessarily obtaining evidence sufficient to prove guilt beyond a reasonable doubt." *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 467 (3d Cir. 2016).

Despite the probable cause standard outlined above, it is not always necessary for the arresting officer himself to possess the facts and circumstances sufficient to warrant a reasonable person to believe an offense has been committed. *See Rogers v. Powell*, 120 F.3d 446, 453 (3d

---

[3]Plaintiff's false imprisonment claim is not distinct from his false arrest claim. The essence of both claims is that the arrest was made without probable cause. *See Sherwood*, 113 F.3d at 401 ("A false imprisonment claim under § 1983 which is based on an arrest made without probable cause . . . is grounded in the Fourth Amendment's guarantee against unreasonable seizures.").

9

Cir. 1997). An arrest can still be legal when the arresting officer relies on statements issued by fellow officers that possessed the requisite basis to seize the suspect. *Id.* In that circumstance, the fellow officers issuing the statements must "possess[] the facts and circumstances necessary to support a finding" of probable cause. *Id.* The Third Circuit has definitively stated that "[t]he collective knowledge of the investigating officers is measured in determining probable cause" to make an arrest. *United States v. Belle*, 593 F.2d 487, 497 n. 15 (3d Cir. 1979).

Defendants allege that Angelo's actions were "protected under the long recognized fellow officer/collective knowledge doctrine." (D.I. 53 at 6). According to Defendants, Angelo could rely on the information provided by the KentCom dispatch calls in making his arrest. Additionally, Defendants argue that Angelo was justified in following his supervisor's instructions and Detective Surowiec's request that Smith be found and detained. (D.I. 53 at 3).

Plaintiff contends that the collective knowledge doctrine is inapplicable to this case because "the totality of the circumstances demonstrate that there was no probable cause or reasonable suspicion to detain Mr. Smith." (D.I. 60 at 11). In order for the collective knowledge doctrine to apply, according to Plaintiff, Detective Surowiec needed probable cause to arrest Plaintiff for that probable cause to then be imputed to Angelo when he acted in accordance with Surowiec's instruction. *Id.* Interestingly, Plaintiff concludes that Angelo relied solely "upon instruction from Detective Surowiec in order to conclude that Plaintiff should be detained." Plaintiff posits that since Detective Nash reported to Surowiec and Detective Weaver what he had observed at the scene where Tiffany Smith was found, and Detective Weaver concluded that he would not have had Plaintiff detained, Surowiec was wrong to conclude that Plaintiff should be detained.

The court must first clarify that, though Plaintiff argues both that there was no reasonable

suspicion and that there was no probable cause, the only issue here is whether or not probable cause existed. There is really no way, according to relevant case law, that Plaintiffs' detainment could be considered an investigatory stop. *See Hayes v. Florida*, 470 U.S. 811, 816 (1985) (explaining that an investigation becomes an arrest when a person is forcibly taken from a "place in which he is entitled to be and transported[ed] . . . to the police station, where he is detained, although briefly, for investigative purposes"). Accordingly, Plaintiff's detainment cannot be predicated on reasonable suspicion. *See Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S. Ct. 673, 675, 145 L. Ed. 2d 570 (2000) (explaining that an officer can conduct a brief investigatory stop when the officer had a "reasonable, articulable suspicion that criminal activity is afoot"). Plaintiff was taken from his car, transported to the police station, and briefly held in a cell for investigative purposes. Such a "detainment" is sufficiently like an arrest to necessitate that it be made based on probable cause. *See Hayes*, 470 U.S. at 816.

The court finds that probable cause to arrest was based on both Detective Surowiec's knowledge, imputed to Angelo, and Angelo's own knowledge derived from the reports dispatched over Kentcom.

Angelo testified at his deposition that he decided to detain Plaintiff "[based] on the request of the Delaware State Police that he was at the time a suspect in a crime." A-056, 24:15–17. When Defendants' attorney asked Angelo if he relied upon information that was conveyed to him by Detective Surowiec, Angelo responded that he relied on "[i]nformation that was broadcast over KentCom." *Id.* 24:21–24. When asked if he would have detained Plaintiff without Detective Surowiec's request, Angelo responded: "Yes, had I heard the broadcast that he was a suspect in a crime." *Id.* 25:7–8. The record is clear though that Angelo waited for Surowiec's instruction before arresting Plaintiff. A-062, 47:15–49:15. Accordingly, the court has analyzed both

11

Surowiec's and Angelo's knowledge existing at the time of arrest to arrive at its ultimate conclusion that Plaintiff's arrest was supported by probable cause.

As the Third Circuit has recognized, Angelo could arrest Plaintiff based on Surowiec's instruction to detain Plaintiff as long as Surowiec possessed sufficient facts to support probable cause. *See Rogers*, 120 F.3d at 453. Surowiec's police report from the events that took place on August 28, 2012, states that he made the decision to detain Plaintiff after speaking with Detective Cosgrove and considering "the lengthy history between the two parties, the severity of the incident (as it was first presented to [him]), the safety of the couple's children, as well as the safety of the public in general." A-190. Detective Surowiec also reported that he was initially concerned that this incident could be an attempted homicide. *Id.* The court acknowledges that Surowiec's report was created almost a week after the incident, but finds that the report was corroborated by the statements that went out over KentCom and the reports of other officers involved in the incident.

It is clear that prior to the time when Surowiec gave Angelo the "go ahead" to detain Plaintiff, KentCom reported the following facts: (1) suspect was Gordon Smith; (2) Gordon Smith was on home probation; (3) Gordon Smith had a history of assault; (4) Gordon Smith was a convicted domestic offender; and (4) there was an active Protection from Abuse Order dated August 28, 2012. A-179. It is also clear that Angelo was listening to Kentcom prior to the arrest and likely heard these facts as well. Further, Tiffany Smith's mother called KentCom before 6:48pm and reported that she went to court with Tiffany that day to get the Protection from Abuse Order, and, after the hearing, Gordon Smith told Tiffany that he was going to kill her and their children. A-177. It is highly probable that, given Surowiec's statement in his report, these facts were relayed to Suroweic by Cosgrove, or Office Saucier, or a combination of both of them. A-190. The record is not clear as to whether Cosgrove told Surowiec that Tiffany identified her

12

husband as her attacker or whether Surowiec told Cosgrove that information. A-182; A-190. Such a discrepancy between the factual accounts of the incident is, however, immaterial.

The operative facts for purposes of the probable cause determination are that Surowiec and Angelo knew that there were allegations of previous domestic abuse incidents and that Tiffany Smith had implicated Plaintiff in her attack. When a victim identifies her attacker, and the officers have no reason to doubt her credibility at the time of arrest, such an identification is typically enough to establish probable cause. *See Wilson v. Russo*, 212 F.3d 781, 790 (3d Cir. 2000) (explaining that a positive identification by a victim is usually sufficient to establish probable cause unless there is substantial evidence of the witness's own unreliability that is known by the arresting officers); *see also Sharrar v. Felsing*, 128 F.3d 810, 818 (3d Cir. 1997) ("When a police officer has received a reliable identification by a victim of his or her attacker, the police have probable cause to arrest."), abrogated on other grounds by *Curley v. Klem*, 499 F.3d 199, 209 (3d Cir. 2007). Here, not only did Tiffany Smith identify her attacker, but there is also evidence in the record—the KentCom reports of Gordon Smith's criminal history and Tiffany Smith's mother's phone call to the Delaware State Police—that corroborates the victim's identification of her attacker. Thus, based on the record presented to the court, a reasonable jury could not find that Plaintiff's arrest violated the Fourth Amendment.

Plaintiff disputes the reliability of Tiffany Smith's identification, thus undermining Angelo's probable cause to arrest Plaintiff. Plaintiff questions why Tiffany Smith did not think to call 911, instead of her mother, to report the incident. (D.I. 60 at 12). Plaintiff also states that Detective Nash made no notes of any significant injuries on Tiffany Smith's body in his report from the scene. *Id.* If Tiffany Smith did not have serious injuries, Plaintiff reasons, Angelo and Suroweic were wrong to rely on the severity of the assault as a basis for probable cause to arrest

Plaintiff. *Id.* Plaintiff's arguments do not present a genuine dispute of material fact.

The probable cause analysis is one based in common sense and a collation of the entire factual background. *See Sharrar*, 128 F.3d 810, 818. For good reason, officers relax the skepticism applied to a confidential informant's information when the informant is an identified victim. *See Sharrar*, 128 F.3d 810, 818 (3d Cir. 1997) (citing *Easton v. City of Boulder*, 776 F.2d 1441, 1449 (10th Cir. 1985)). The court recognizes, like the Third Circuit, that "[t]he cloistered nature of domestic violence is such that the testimony of the battered spouse and the injury itself may be the only evidence available to establish probable cause." *Id.* at 818 (quoting *Sharrar v. Felsing*, No. CIV.A. 94-1878 (JEI), 1996 WL 117162, at *3 (D.N.J. Mar. 7, 1996)). While it later became clear that Tiffany Smith's allegations were fabricated, nothing in the record indicates that the officers involved suspected that fact when the arrest took place.[4]

Additionally, the fact that Detective Weaver would not have advised that Plaintiff be detained is irrelevant. Detective Weaver never went to the scene of the alleged crime. A-138, 8:23–24. He went to straight to talk to Tiffany Smith in the hospital. *Id.* Detective Weaver testified that he had no idea when the order was given to detain Plaintiff or who gave it—his "focus was on Tiffany." A-140, 15:2–18. Detective Weaver gathered information at the hospital that Surowiec, Cosgrove and Angelo were not privy to prior to their decision to detain Plaintiff. Accordingly, Detective Weaver's thoughts on whether or not Plaintiff should have been detained

---

[4] The court is aware of Officer Angelo's interaction with Detective Csapo. In Angelo's deposition, he indicates that Detective Csapo contacted him and asked if Angelo could review Plaintiff's GPS points from August 24, 2012, to see if he had been in the vicinity of Tiffany Smith's car. A-054, 15:12–23. Tiffany Smith reported to police that Plaintiff had left a threatening note on her car. *Id.* Angelo informed Detective Csapo that, after reviewing the GPS points for that day, it did not look like Plaintiff was in the vicinity of Tiffany Smith's car. *Id.* These facts are immaterial, however. They do nothing to undermine Tiffany Smith's credibility in Angelo's eyes on the night of August 28, 2012, and no reasonable jury could find otherwise. Angelo's only connection to the incident on August 24th was to tell Detective Csapo that it did not look like Plaintiff was in the area of Ms. Smith's car. It is too large a leap to conclude that, because Plaintiff was not near Tiffany Smith's car on August 24th, that Angelo had reason to know that Tiffany Smith had made false allegations in the past, and therefore, likely staged the entire assault scene on the August 28, 2012.

are immaterial to the probable cause analysis.

From Detective Nash's perspective—the first officer on the scene and the one to relay information to Saucier, Suroweic, and Cosgrove—there was a disoriented women found on the side of the road, stripped of her clothes, with the words "bitch" and "die" etched on her body. Emergency medical services at the scene felt that her injuries were sufficient to warrant a trip to the hospital. This woman identified her husband as her attacker to a civilian who solicited that response at the behest of the police dispatcher. The existence of probable cause to arrest is evident from those facts alone. There were, however, two additional facts that lent credence to her story: (1) she had an active Protection from Abuse Order against Plaintiff; and (2) her mother called Troop 3 and reported that Plaintiff had threated Tiffany Smith's life and the lives of their children. Analysis of the totality of the circumstances reveals that there was probable cause to arrest Plaintiff. A reasonable jury could not find differently.

Lastly, Plaintiff's argue that, even if the facts known to the police officers at the time of arrest may have been sufficient to establish probable cause, Angelo should have checked Plaintiff's GPS points to exonerate him. There is no constitutional requirement, however, that police officers continue to investigate claims of innocence once probable cause is established. *See Lincoln v. Hanshaw*, 375 F. App'x 185, 190 (3d Cir. 2010) ("The officers had no further constitutional duty to continue their investigation in an attempt to unearth potentially exculpatory evidence undermining the probable cause determination."). There is a dispute over how easy Plaintiff's GPS points were to obtain, but that dispute is immaterial because probable cause existed at the time of arrest.

### B. Qualified Immunity

Even when a state actor is alleged to have violated a federal right, that actor may be entitled

15

to qualified immunity from suit. *See Burella v. City of Philadelphia*, 501 F.3d 134, 139 (3d Cir. 2007). To determine whether a defendant is entitled to qualified immunity, "a court must first determine if, assuming the facts alleged in the complaint are true, defendant's conduct violated a constitutional or statutory right and, if so, whether the right allegedly violated was 'clearly established' at the time of the violation." *Id.* If the right was clearly established at the time of the violation, qualified immunity cannot shield the defendant from liability. *Id.* at 140.

Here, the court determined that Angelo's conduct did not violate a constitutional right, namely, the right to be free from unreasonable search and seizure guaranteed by the Fourth Amendment. Accordingly, the court does not need to proceed to the second prong of the qualified immunity analysis. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (holding that district court judges are permitted to exercise their discretion—in light of the circumstances of each case—in deciding which prong of qualified immunity to address first).

## C. Excessive Force

A claim of excessive force that arises in the context of a seizure incident to an investigative stop or an arrest is "most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons . . . against unreasonable . . . seizures' of the person." *Graham v. Connor*, 490 U.S. 386, 394 (U.S. 1989). The relevant question for the court is whether the officer's use of force was objectively reasonable given the circumstances surrounding the seizure. *Id.* at 397. "The right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* at 396. The test of reasonableness under the Fourth Amendment requires careful analysis of the circumstances of the particular case, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the

16

officers or others, and whether he is actively resisting arrest of attempting to evade arrest by flight." *Id.*

Here, the court finds no need to analyze the Defendants' conduct leading up to the arrest. Plaintiff conceded that there was no excessive force claim against Defendants Danberg, Coupe, Fraley, or Weaver. According to Plaintiff's briefing, it appears he is pursuing an excessive force claim against Defendant Angelo for detaining Plaintiff for "more than an hour" without probable cause. *See* (D.I. 60 at 17) ("Although Defendant Angelo was not the individual who held Plaintiff at gunpoint, it is fair to attribute the actions of Defendant Angelo's fellow officers to him . . . ."). Additionally, Plaintiff alleges that Probation Officer Wheeler "act[ed] without probable cause, touch[ed] Mr. Smith, forc[ed] him to move from his location, and point[ed] a loaded gun at him," which "all constitute acts of excessive force given the circumstances." *Id.*

To properly plead a § 1983 action for excessive force in violation of the Fourth Amendment, "a plaintiff must plead that each Government-official defendant, through the official's *own individual actions*, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676, 129 S. Ct. 1937, 1948, 173 L. Ed. 2d 868 (2009) (emphasis added). Accordingly, the concept of vicarious liability is inapplicable to § 1983 actions. *Id.*

Plaintiff's claim against Angelo fails because it is undisputed that Angelo did not remove Plaintiff from his vehicle and point a loaded gun at him. Plaintiff was tracked to the parking lot of the Texas Roadhouse in Camden, Delaware, where he was found sitting in his car. A-063, 52:8–23. Angelo approached Plaintiff's car on the passenger side. A-055, 20:23–24. It was Probation Officer Wheeler—an individual who is not a defendant in this action—that removed Plaintiff from his vehicle and held him at gunpoint. A-029, 71:16–73:7; A063–A064, 53:18–54:3; (D.I. 60 at 16). It seems that Plaintiff is trying to assert a claim of vicarious liability

17

against Angelo for the actions of his fellow probation officers. Such a claim must fail as a matter of law.

To support his claim for excessive force, Plaintiff also alleges that Defendants, without probable cause, arrested him, moved him from his location, and detained him for over an hour. (D.I. 60 at 16). Such allegations do not support a claim of excessive force. The court need not belabor the point and check off the factors for proving an excessive-force claim because plaintiff's claim clearly falls short. The court already addressed the lawfulness of the arrest, finding that probable cause existed and that Plaintiff's arrest did not violate the Fourth Amendment. Transporting Plaintiff to Troop 3 and detaining him were not objectively unreasonable acts because they were incident to an arrest supported by probable cause and, according to Plaintiff, detainment only lasted for about two and a half hours. *See Stewart v. Abraham*, 275 F.3d 220, 228 (3d Cir. 2001) ("[A] state may arrest and detain an individual without a warrant if it has probable cause and provides for review of the probable cause determination by a neutral party within 48 hours of the arrest."). Plaintiff's claim for excessive force, therefore, fails as a matter of law.

### D. Gross Negligence

From Plaintiff's opposition brief, it appears that he is asserting a claim of gross negligence against only Defendant Angelo. (D.I. 60 at 18). Plaintiff's Complaint alleges that Angelo "owed a duty to act according to the standard of ordinary care of a correction officer or a police officer, to wit, to conduct a proper investigation, the failure of which was the proximate cause of Plaintiff's injury. (D.I. 2 ¶ 56). Plaintiff's opposition brief asks the court to exercise supplemental jurisdiction over the gross negligence claim against Angelo because "Angelo discharged his duties

as a probation officer in a manner that was a sharp departure from the standard of conduct for a reasonable probation officer." (D.I. 60 at 19).

From Plaintiff's Complaint, it appears that he is asserting an ordinary negligence claim, referencing "the standard of ordinary care of a correction officer or police officer." As Defendants point out, the Torts Claims Act, 10 Del. C. § 4001, exempts state employees from civil liability based on a theory of negligence if three criteria are satisfied:

> The act or omission complained of (i) arose out of and in connection with official duties involving the exercise of discretion; (ii) was performed in good faith and in the belief that the public interest would be best served thereby; and (iii) was performed without gross and wanton negligence.

*Lee v. Johnson*, No. 96C-03-291-WTQ, 1996 WL 944868, at *2 (Del. Super. Ct. June 4, 1996). Plaintiff has the burden of alleging facts that negate the existence of the three criteria. *Id.* Plaintiff has not set forth sufficient facts to meet that requirement. The court thus proceeds to the analysis of gross negligence.

In order to hold Angelo liable for gross negligence, Plaintiff would need to show first that Angelo's "negligent act or omission breached a duty of care owed to the plaintiff in a way that proximately caused the plaintiff's injuries." *Drummond v. Delaware Transit Corp.*, 365 F. Supp. 2d 581, 585 (D. Del. 2005). Plaintiff would also need to show that Angelo's behavior demonstrated "a higher level of negligence representing 'an extreme departure from the ordinary standard of care.'" *Browne v. Robb*, 583 A.2d 949, 953 (Del. 1990) (quoting W. Prosser, *Handbook of the Law of Torts* 150 (2d. ed. 1955)). The court could not find any case in Delaware where a plaintiff brought a state law claim against a police officer for failure to properly investigate the alleged crime. Plaintiff cited no case law to support his claim.

Plaintiff could have alleged a due process claim for failure to investigate. As the court previously mentioned, however, the Constitution does not require officers to continue to

19

investigate potentially exculpatory evidence once probable cause is established. *See Eckman v. Lancaster City*, 742 F. Supp. 2d 638, 653 (E.D. Pa. 2010), *aff'd*, 515 F. App'x 93 (3d Cir. 2013), and *aff'd*, 529 F. App'x 185 (3d Cir. 2013). "To bring a successful due process claim for failure to investigate, a plaintiff must show that a police officer acted intentionally or recklessly, in a manner that shocks the conscience, in failing to investigate." *Id.* Plaintiff is not, however, alleging a due process violation here. Plaintiff is alleging gross negligence under Delaware Law. (D.I. 2 ¶¶ 54–59). Because Delaware case law does not impose a duty on police officers to investigate potentially exculpatory evidence after probable cause is established, Plaintiff fails to state a viable claim under Delaware law. Accordingly, Plaintiff's gross negligence claim fails as a matter of law.

## V. CONCLUSION

For the aforementioned reasons, the court will grant the Defendants' Motion for Summary Judgment.

Dated: May 25, 2017

UNITED STATES DISTRICT JUDGE

20